IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 16-14814

---

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., ANIMAL LEGAL DEFENSE FUND, HOWARD GARRETT, and ORCA NETWORK,

*Appellants*,

v.

MIAMI SEAQUARIUM and FESTIVAL FUN PARKS, LLC, d/b/a PALACE ENTERTAINMENT,

*Appellees.*

---

# BRIEF OF APPELLEES MIAMI SEAQUARIUM AND FESTIVAL FUN PARKS, LLC, D/B/A PALACE ENTERTAINMENT

---

ON APPEAL FROM THE UNITED DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

---

James Hardwick Lister (pro hac vice)
William A. Earnhart (pro hac vice)
Melinda L. Meade Meyers (pro hac vice)
Birch Horton Bittner and Cherot, P.C.
1156 15th Street, NW, Suite 1020
Washington, DC 20005
Telephone: 202.659.5800

Elliot H. Scherker
Brigid F. Cech Samole
Greenberg Traurig, P.A.
333 SE 2nd Avenue, Suite 4400
Miami, FL 33131
Telephone: 305.579.0500

*Counsel for Festival Fun Parks, LLC, d/b/a Miami Seaquarium and d/b/a Palace Entertainment*

***People for the Ethical Treatment of Animals, Inc, et al. v. Miami Seaquarium, et al.***

**Case No. 16-14814-B**

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, the Defendants-Appellees submit this list, which includes all trial and magistrate judges, and all attorneys, persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of this case:

1. Animal Legal Defense Fund
2. Birch Horton Bittner and Cherot P.C.
3. Cech Samole, Brigid F.
4. Cobos, Evelyn A.
5. Coffey Burlington, P.L.
6. Earhart, William A.
7. Festival Fun Parks, LLC d/b/a Miami Seaquarium and d/b/a Palace Entertainment
8. Garrett, Howard
9. Goodman, Jared
10. Greenberg Traurig, P.A.
11. Hawks, Caitlin

***PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC, ET AL. V. MIAMI SEAQUARIUM, ET AL.***

**CASE NO. 16-14814-B**

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (Continued)**

12. Hiaasen, Scott A.
13. Liebman, Matthew
14. Lister, James H.
15. Meade Meyers, Melinda L.
16. Moore, Jennifer B.
17. Orca Network
18. Otazo-Reyes, The Honorable Alicia M.; United States Magistrate Judge, Southern District of Florida
19. People for the Ethical Treatment of Animals, Inc.
20. PETA Foundation
21. Salky, Mark A.
22. Schwiep, Paul J.
23. Strugar, Matthew D.
24. Scherker, Elliot H.
25. Ungaro, The Honorable Ursula; United States District Judge, Southern District of Florida
26. Wilson, Stefanie

***People for the Ethical Treatment of Animals, Inc, et al. v. Miami Seaquarium, et al.***

**Case No. 16-14814-B**

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (Continued)**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Defendant-Appellee, Festival Fun Parks, LLC, makes the following statements as to corporate ownership:

Festival Fun Parks, LLC's parent company is Palace Entertainment Holdings, LLC. No publicly-traded company owns more than 10% of the ownership interests in Festival Fun Parks, LLC.

/s/ Elliot H. Scherker
Elliot H. Scherker

## STATEMENT REGARDING ORAL ARGUMENT

This appeal is taken from a summary judgment. The district court's extensive order sets forth both the pertinent facts and the legal basis for the court's ruling. The issues before this Court may readily be addressed on the record and briefs, without oral argument.

# TABLE OF CONTENTS

**Page**


CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ....C-1

STATEMENT REGARDING ORAL ARGUMENT ....i

TABLE OF CITATIONS ....v

STATEMENT OF JURISDICTION....1

I. STATUTORY JURISDICTION. ....1

II. LACK OF STANDING. ....1

A. The District Court's Ruling. ....1

1. The parties' submissions. ....2

2. The summary judgment. ....4

B. PETA Lacks Standing. ....6

1. The *Havens* doctrine. ....6

2. PETA has suffered no injury-in-fact. ....9

C. Causation and Redressability. ....12

1. Causation. ....12

2. Redressabililty. ....13

STATEMENT OF THE ISSUE ....14

STATEMENT OF THE CASE AND FACTS ....14

I. INTRODUCTION. ....14

II. COURSE OF PROCEEDINGS. ....15

III. STATEMENT OF FACTS ....16

A. Lolita's Residence at Seaquarium. ....16

B. The Summary Judgment Order. ....18

1. The district court's statutory construction analysis. ....18

2. The district court's ruling on Plaintiffs' claims. ....24

IV. STANDARD OF REVIEW. ....25

SUMMARY OF ARGUMENT ....26

ARGUMENT ....27

I. THE DISTRICT COURT CORRECTLY CONSTRUED THE ESA's DEFINITION OF "TAKE." ....27

A. The District Court Correctly Interpreted the Statutory Text. ....28

1. Interpreting the language. ....28

2. *Noscitur a sociis.* ....30

3. *Sweet Home.* ....34

B. The District Court's Construction Is Consistent with ESA's Legislative History and Administrative Interpretations of "Take." ....37

1. Legislative history supports the court's interpretation of "harm" and "harass." ....37

2. The district court correctly relied on agency interpretations. ....39

II. THE DISTRICT COURT CORRECTLY HARMONIZED THE ESA AND AWA IN GRANTING SUMMARY JUDGMENT. ....43

A. Overview. ....43

B. The District Court Correctly Harmonized the ESA and AWA. ....................44

C. The District Court Correctly Relied on APHIS's Findings. ....................49

CONCLUSION ....................52

CERTIFICATE OF SERVICE ....................54

CERTIFICATE OF COMPLIANCE ....................55

## TABLE OF CITATIONS

**Page**

**Cases**

*Abramski v. United States*,
134 S. Ct. 2259 (2014)....................29

*Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009)....................5

*Am. Gen. Life Ins. v. Schoenthal Family, LLC*,
555 F.3d 1331 (11th Cir. 2009)....................51

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
659 F.3d 13 (D.C. Cir. 2011)....................13

*Ams. for Safe Access v. D.E.A.*,
706 F.3d 438 (D.C. Cir. 2013)....................10

*Animal Legal Defense Fund v. U.S. Dep't of Agric.*,
789 F.3d 1206 (11th Cir. 2015)....................3, 51

*Animal Legal Defense Fund v. U.S. Dep't of Agric.*,
No. 13-20076, 2014 WL 11444100 (S.D. Fla. Mar. 25, 2014),
*aff'd*, 789 F.3d 1206 (11th Cir. 2015)....................3

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014)....................8

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*,
178 F.3d 350 (5th Cir. 1999)....................10, 11

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
515 U.S. 687 (1995)....................*passim*

*Bennett v. Spear*,
520 U.S. 154 (1997)....................11

**TABLE OF CITATIONS**
(Continued)

*Carver Middle Sch. Gay-Straight All. v. Sch. Bd. of Lake Cty., Fla.*,
842 F.3d 1324 (11th Cir. 2016) ....................25

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ....................8

*Ctr. for Biological Diversity v. APHIS*,
No. 10-14175, 2011 WL 4737405 (S.D. Fla. Oct. 6, 2011) ....................50

*Ctr. for Law & Educ. v. Dep't of Educ.*,
396 F.3d 1152 (D.C. Cir. 2005) ....................10

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ....................51, 52

*Doe v. Naval Air Station, Pensacola, Fla.*,
768 F.2d 1229 (11th Cir. 1985) ....................31

*Dolan v. Postal Serv.*,
546 U.S. 481 (2006) ....................29

*EEOC v. Catastrophe Mgmt. Sols.*,
No. 14-13482, 2016 WL 7210059 (11th Cir. Dec. 13, 2016) ....................42

*Equal Rights Ctr. v. Post Props, Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ....................11

*Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*,
141 F.3d 71 (3d Cir. 1998) ....................12

*Fla. Pub. Interest Research Grp. Citizen Lobby, Inc. v. E.P.A.*,
386 F.3d 1070 (11th Cir. 2004) ....................6

*Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*,
647 F.3d 1296 (11th Cir. 2011) ....................1, 22

*Florida State Conference of N.A.A.C.P. v Browning*,
522 F.3d 1153 (11th Cir. 2008) ....................7, 8

**TABLE OF CITATIONS**
(Continued)

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015)....................9

*Ga. Latino Alliance for Human Rights v. Governor of Ga.*,
691 F.3d 1250 (11th Cir. 2012)....................8

*Garcia v. Vanguard Car Rental USA, Inc.*,
540 F.3d 1242 (11th Cir. 2008)....................30

*Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*,
8 F.3d 760 (11th Cir. 1993)....................52

*Graham v. San Antonio Zoological Society*,
No. 5:15-cv-1054-XR (W.D. Tex. Jan. 27, 2016)....................50

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)....................6, 7, 8, 10

*Hispanic Interest Coal. of Ala. v. Governor of Ala.*,
691 F.3d 1236 (11th Cir. 2012)....................8

*Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*,
641 F.3d 1259 (11th Cir. 2011)....................14

*In re Polar Bear Endangered Species Act Listing & § 4(d) Rule Litig.*,
818 F. Supp. 2d 214 (D.D.C. 2011)....................41

*Kawa Orthodontics, LLP v. Sec'y, U.S. Dep't of Treasury*,
773 F.3d 243 (11th Cir. 2014)....................13

*Kuehl v. Sellner*,
161 F. Supp. 3d 678 (N.D. Iowa 2016), *appeal pending* (8th Cir. No. 16-1624)....................50

*Likes v. DHL Express (USA), Inc.*,
787 F.3d 1096 (11th Cir. 2015)....................25

*Lowery v. Ala. Power Co.*,
483 F.3d 1184 (11th Cir. 2007)....................38

**TABLE OF CITATIONS**
(Continued)

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)....................6, 13, 14

*McDonnell v. United States*,
136 S. Ct. 2355 (2016)....................*passim*

*McKissick v. Busby*,
936 F.2d 520 (11th Cir. 1991)....................51

*N.A.A.C.P. v. City of Kyle, Tex.*,
626 F.3d 233 (5th Cir. 2010)....................11, 12

*Norelus v. Denny's, Inc.*,
628 F.3d 1270 (11th Cir. 2010)....................5, 51

*People for the Ethical Treatment of Animals, Inc. v. Mobile Zoo*,
No. 16-00030, 2016 WL 286719 (S.D. Ala. Jan. 19, 2016)....................3

*People for the Ethical Treatment of Animals v. USDA*,
797 F.3d 1087 (D.C. Cir. 2015)....................9, 10

*POM Wonderful LLC v. Coca-Cola Co.*,
134 S. Ct. 2228 (2014)....................29, 48, 49

*Scott v. Schedler*,
771 F.3d 831 (5th Cir. 2014)....................11

*Serrano v. U.S. Attorney Gen.*,
655 F.3d 1260 (11th Cir. 2011)....................39, 43

*Sierra Club v. Morton*,
405 U.S. 727 (1972)....................6

*Sierra Club v. Van Antwerp*,
526 F.3d 1353 (11th Cir. 2008)....................50

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)....................42

*Spann v. Colonial Vill., Inc.*,
899 F.2d 24 (D.C. Cir. 1990)....................11

**TABLE OF CITATIONS**
(Continued)

*Strahan v. Roughead*,
910 F. Supp. 2d 358 (D. Mass. 2012) ....................41

*Tilikum ex. rel. People for the Ethical Treatment of Animals, Inc. v. Sea World Parks & Entm't, Inc.*,
842 F. Supp. 2d 1259 (S.D. Cal. 2012) ....................2

*TVA v. Hill*,
437 U.S. 153 (1978) ....................27

*U.S. Steel Mining Co. v. Dir., OWCP*,
719 F.3d 1275 (11th Cir. 2013) ....................38

*United States v. Costello*,
666 F.3d 1040 (7th Cir. 2012) ....................34

*United States v. Hayashi*,
22 F.3d 859 (9th Cir. 1993) ....................31

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
133 S. Ct. 2517 (2013) ....................42

*Yates v. United States*,
135 S. Ct. 1074 (2015) ....................33

**Statutes**

5 U.S.C. § 706(2) ....................50

7 U.S.C. § 2131 ....................45

7 U.S.C. § 2143 ....................17, 45

7 U.S.C. § 2145(a) ....................48

16 U.S.C. § 1362 ....................31

16 U.S.C. § 1372(a)(1) ....................16

16 U.S.C. § 1531 ....................49

16 U.S.C. § 1531(b) ....................27

**TABLE OF CITATIONS**
(Continued)

16 U.S.C. § 1532(19) ........................................................................19, 28

16 U.S.C. § 1533(a)(1) ........................................................................20, 39

16 U.S.C. § 1538(a)(1)(B) ........................................................14, 15, 19, 28

16 U.S.C. § 1538(a)(1)(C) ........................................................................28

16 U.S.C. § 1540 ........................................................................1

16 U.S.C. § 1540(g)(1) ........................................................................6

16 U.S.C. § 1540(h) ........................................................................47

18 U.S.C. § 201(a)(3) ........................................................................32, 33

28 U.S.C. § 1291 ........................................................................1

28 U.S.C. § 1331 ........................................................................1

**Regulations**

50 C.F.R. § 17.1(a) ........................................................................41

50 C.F.R. § 17.3 ........................................................22, 34, 41, 46

50 C.F.R § 216.27(a)(1)(iii) ........................................................................18

50 C.F.R. § 222.101(a) ........................................................................40

50 C.F.R. § 222.102 ........................................................................40

9 C.F.R. § 3.101-110 ........................................................................17

*Amendment to the Endangered Species Act Listing of the Southern Resident Killer Whale Distinct Population Segment*, 80 Fed. Reg. 7380 (Feb. 10, 2015) ........................................................................40, 42

*Captive-bred Wildlife Reg.,* 63 Fed. Reg. 48634 (Sept. 11, 1998) ........................................................................41, 42, 45, 46

*Endangered & Threatened Wildlife & Plants; Final Redefinition of "Harm,"* 46 Fed. Reg. 54748 (Nov. 4, 1981) ........................................29

**TABLE OF CITATIONS**
(Continued)

*Endangered & Threatened Wildlife & Plants; Revision of the Section 4(d) Rule for the African Elephant (Loxodonta africana)*, 80 Fed. Reg. 45154 (July 29, 2015) .......... 47

*Endangered & Threatened Wildlife & Plants; Revision of the Section 4(d) Rule for the African Elephant (Loxodonta africana)*, 81 Fed. Reg. 36388 (June 16, 2016) .......... 47

*Marine Mammals; Humane Handling, Care, Treatment, and Transportation*, 44 Fed. Reg. 36868 (June 22, 1979) .......... 48

*Special Rule for the Polar Bear*, 73 Fed. Reg. 76249 (Dec. 16, 2008) .......... 31, 41

**Rules**

Federal Rule of Evidence 702 .......... 51

**Legislative Materials**

S. Rep. No. 93-307 (1973), *as reprinted in* U.S.C.C.A.N. 2989 .......... 28, 38, 47

**Other Authorities**

1977-1978 FWS MMPA Ann. Rep. .......... 48

Enchanted Learning, *U.S. States (plus Washington D.C.): Area & Ranking*, www.enchantedlearning.com/usa/states/area.shtml (last visited Feb. 9, 2017) .......... 45

Webster's Third New Int'l Dictionary (1961) .......... 28, 32

# STATEMENT OF JURISDICTION

## I. STATUTORY JURISDICTION.

The district court had statutory jurisdiction. 28 U.S.C. § 1331; 16 U.S.C. § 1540. This Court has jurisdiction under 28 U.S.C. § 1291.

## II. LACK OF STANDING.

Standing is raised before this Court because it goes to subject matter jurisdiction. *E.g., Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011). Defendants-Appellees (collectively, Seaquarium) challenged the standing of Plaintiffs-Appellants (Plaintiffs) on summary judgment, and also sought summary judgment on the merits of Plaintiffs' claims. The district court ruled that Plaintiff People for the Ethical Treatment of Animals, Inc. (PETA) had standing to bring an action under the Endangered Species Act (ESA)—but granted summary judgment for Seaquarium on the merits. (R:203).

Plaintiffs appealed, and Seaquarium took a cross-appeal to raise lack of standing. After jurisdictional briefing, the Court dismissed the cross-appeal as unnecessary, ruling that Seaquarium may raise standing in this brief.

### A. The District Court's Ruling.

Lolita (also referred to as Toki) is a legally captured Southern Resident Killer Whale (SRKW or orca), residing at Seaquarium. (R:203:2-3). Seaquarium is licensed by the Animal Planet Health Inspection Services (APHIS), an agency within the Department of Agriculture (USDA). (R:203:4). APHIS administers the Animal Welfare Act (AWA) and implementing regulations. (R:203:4). Following reviews in 2011-12, APHIS determined that Seaquarium's treatment of Lolita

complies with AWA requirements. (R:203:4-5). Plaintiffs sued Seaquarium, alleging a "take" of Lolita under the Endangered Species Act (ESA). (R:1).

**1. The parties' submissions.**

**a. PETA's use of litigation.**

PETA is a self-described "non-profit organization … dedicated to protecting animals from abuse, neglect, and cruelty." (R:133:2). A declaration by its general counsel states that "PETA uses public education, cruelty investigations, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, and administrative comments and complaints to educate the public and enforce laws enacted to protect animals." *Id.*

PETA also uses litigation as a tool (R:167:3)—and this case is the most recent chapter in PETA's orca litigation strategy:

- In 2011, PETA and other plaintiffs filed an action in the Southern District of California, as purported "next friends" of five orcas. *Tilikum ex. rel. People for the Ethical Treatment of Animals, Inc. v. Sea World Parks & Entm't, Inc.*, 842 F. Supp. 2d 1259, 1260 (S.D. Cal. 2012). PETA asserted standing under the Thirteenth Amendment (applied to animals), which the court rejected. *Id.* at 1263-65.
- Eight months after that ruling, PETA, together with other plaintiffs (some of whom are plaintiffs in this case) brought an action against the USDA under the Administrative Procedure Act (APA), in the Northern District of California, challenging USDA's renewal of Seaquarium's license, alleging that Lolita was being housed "under

conditions that violate the USDA's standards for issuance of a license with respect to" among other things, "minimum tank size." *Animal Legal Defense Fund v. U.S. Dep't of Agric.*, No. 13-20076, 2014 WL 11444100, at *1 (S.D. Fla. Mar. 25, 2014), *aff'd*, 789 F.3d 1206 (11th Cir. 2015). The case was transferred to the Southern District of Florida, which upheld the USDA. *Id.* at *7-8.

- This Court affirmed. *Animal Legal Defense Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1223-25 (11th Cir. 2015).
- PETA brought this action in July 2015. (R:1).

Jeffrey Kerr, PETA's general counsel, averred in the APA action that PETA employs "public education, cruelty investigations, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, *and lawsuits to enforce laws enacted to protect*[] *animals*." (R:167:Ex.A:1) (emphasis added). Kerr's declaration in this case, however, elides the word "lawsuits," replacing it with "administrative comments and complaints." (R:133-14:1-2).[1] That rewording cannot hide litigation as a key component of PETA's strategy—which deprives PETA of standing, as will be set forth below.

**b. Standing.**

PETA asserted that "[t]he Seaquarium's continuing 'take' of Lolita frustrates

[1] In a January 2016 complaint in Alabama federal court, PETA stated that it uses, among other things, "administrative petitions and comments, *and lawsuits to enforce laws enacted to protect animals*." Complaint at ¶ 10, *People for the Ethical Treatment of Animals, Inc. v. Mobile Zoo*, No. 16-00030, 2016 WL 286719 (S.D. Ala. Jan. 19, 2016) (emphasis added).

PETA's mission by requiring it to focus its resources on litigation to ensure compliance with established laws rather than on other educational and investigatory efforts, or on administrative comments and legislation." (R:131:5-6). PETA asserted that it "has had to divert substantial resources of money and staff time since at least 2011 to efforts to prevent the Seaquarium from continuing to harm and harass Lolita." (R:131:6). Among those alleged "efforts" are securing Lolita's status under the ESA—that is, adding an animal that the district court noted is "the only [SRKW] presently held in captivity" to protections afforded to SRKWs in the wild (R:203:3)—and "suing the USDA for renewing the Seaquarium's AWA license, and appealing dismissal of that suit." (R:131:6).

Seaquarium argued that, when PETA "sue[s] a defendant such as Miami Seaquarium," PETA is "engaging in [its] mission[], not filing a lawsuit to stop resources from being diverted away from use in [its] mission[]." (R:160:6). PETA's "self-chosen use of resources" does not establish injury. (R:160:8). Moreover, the alleged expenses had been "incurred in PETA's unsuccessful [AWA] litigation," which "concerned most of the same facts and legal standards" as this case. (R:160:10).

Finally, Seaquarium established that PETA had received almost $14,000 in donations all impelled by Lolita. (R:167:3-4). Although PETA claimed to have spent "at least $27,630.29 on … 'litigation and administrative efforts,'" those expenditures were for "counsel and related litigation costs" in the APA case. *Id.*

### 2. The summary judgment.

The district court addressed only PETA's standing, declining to decide

whether any other plaintiff has standing. (R:203:16-17).[2] The court ruled that "the asserted illegal act—the claimed unlawful 'take' of Lolita under ESA—is in direct conflict with PETA's mission of protecting animals." (R:203:10-11) (footnote omitted). Because PETA has "organized and promoted protests against Lolita's conditions," sued the USDA, sought to have Lolita protected under the ESA, and used social media to disseminate information about Lolita, PETA "demonstrate[d] that [its] diversion of resources to address Lolita's captivity, apart from this lawsuit, has impaired its mission of protecting animals from abuse." (R:203:11-12).

The court rejected Seaquarium's argument that "PETA's mission includes litigation," ruling that PETA's "litigation to accomplish its mission … is distinct from litigation itself being PETA's organizational goal." (R:203:13). Also, "[a]n organization's *voluntary* decision to divert resources to counteract the asserted illegal acts, unrelated to the legal challenge itself, qualifies as an injury," such that "PETA's choice to divert its resources … does not disqualify it from claiming injuries." (R:203:14) (original emphasis). "PETA has incurred a net economic loss" from "challeng[ing] the conditions of Lolita's captivity." (R:203:15).

The court further ruled that "[t]he diversion of resources and the conflict

[2] *See Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009) ("[b]ecause [individual plaintiff] has standing … we need not decide whether … organizational plaintiffs [have] … standing"). Plaintiffs cannot defend the district court's ruling by asking this Court to consider any other plaintiff's purported standing. *See, e.g., Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1293 (11th Cir. 2010) ("appellate courts may not make fact findings").

with PETA's mission is directly traceable to the asserted unlawful 'take' … and would be redressed by enjoining Seaquarium from violating the ESA." (R:203:16). Although PETA was not likely to succeed in compelling Seaquarium to "forfeit possession" of Lolita, the court ruled that "redressability goes to PETA's diversion of resources," and enjoining Seaquarium to adhere to the ESA would reduce the likelihood of "divert[ing] [PETA's] resources to challenge the asserted illegal acts." *Id.*

## B. PETA Lacks Standing.

### 1. The *Havens* doctrine.

The ESA's citizen-suit provision, under which "any person" may commence a civil action, 16 U.S.C. § 1540(g)(1), requires a plaintiff to satisfy "the irreducible constitutional minimum of standing": (i) a "concrete and particularized" injury in fact that is "actual or imminent," (ii) causation, and (iii) that actual threatened injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *accord Fla. Pub. Interest Research Grp. Citizen Lobby, Inc. v. E.P.A.*, 386 F.3d 1070, 1083 (11th Cir. 2004). An organization's abstract interest is thus insufficient to establish standing, "no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

Only when an organization's function has been "perceptibly impaired," is there a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—[to] constitute[] far more than simply a setback to the organization's abstract social interests." *Havens Realty*

*Corp. v. Coleman*, 455 U.S. 363, 379 (1982). In *Havens*, a non-profit corporation, whose purpose was fostering "equal opportunity in housing" through a "housing counseling service," used "tester plaintiffs" to uncover discriminatory leasing practices. 455 U.S. at 368-69. The organization and individual plaintiffs sued the defendant leasing company under the Fair Housing Act, and the organizational plaintiff "asserted that the [defendant's] … practices … had frustrated the organization's counseling and referral services, with a consequent drain on resources." *Id.* The Supreme Court held that, if defendant's practices "have perceptibly impaired [the organizational plaintiff's] ability to provide counseling and referral services," it had "suffered injury in fact." *Id.* at 379.

This Court's leading *Havens* decision is *Florida State Conference of N.A.A.C.P. v Browning*, 522 F.3d 1153 (11th Cir. 2008), in which the NAACP and individual plaintiffs challenged a Florida law (referred to as "Subsection 6") that "impose[d] a new verification process as a pre-condition of voter registration for first-time registrants in Florida." *Id.* at 1156. The statutory process required the Florida Department of State to compare a registration application with information in state and federal databases; if the information fails to match, the applicant will not be registered to vote. *Id.* at 1156-57. The NAACP asserted that "Subsection 6 will hinder [plaintiffs'] ability to carry out their mission of registering eligible voters" because "they will have to divert scarce time and resources from registering additional voters to helping applicants correct the anticipated myriad of false mismatches due to errors." *Id.* at 1160 n.9, 1164-65. The defendant asserted that "this shift will be an entirely self-inflicted injury." *Id.* at 1165.

Because "[t]he Florida NAACP plan[ned] to register ten percent of the African-Americans eligible to vote in the upcoming election and personnel that would otherwise be part of this registration effort would have to be diverted to resolving mismatches under Subsection 6," the Court held that the NAACP had "averred that their actual ability to conduct specific projects during a specific period of time will be frustrated by Subsection 6's enforcement." *Id.* at 1166. The court recognized that "plaintiffs cannot bootstrap the cost of detecting and challenging illegal practices into injury for standing purposes," but held that "[c]osts unrelated to the legal challenge are different and do qualify as an injury, whether they are voluntarily incurred or not." *Id.*; *accord Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014) (organizational plaintiffs engaged in "voter registration and education" had standing to challenge efforts to remove non-citizens from voter rolls because organizations would "expend[] resources to locate and assist [their] members to ensure that they were able to vote"); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1349-51 (11th Cir. 2009) (plaintiff had standing to challenge voter-identification law "[b]ecause it will divert resources from its regular activities to … assist voters" in obtaining identification).[3]

This Court thus extends standing to organizational plaintiffs that divert resources from their ordinary advocacy activities to challenge a newly adopted law

[3] This Court has also applied *Havens* to grant organizational standing to plaintiffs challenging state laws affecting undocumented aliens, based on the same rationale. *Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1259-60 (11th Cir. 2012); *Hispanic Interest Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1243-44 (11th Cir. 2012).

or regulation that, if allowed to stand, would deleteriously affect those activities. But this case presents a very different scenario: PETA's ordinary activities *include* litigation, if and when PETA perceives—rightly or wrongly—that animal abuse is taking place. Unlike the voting-rights organizations to which the Court has granted standing, PETA is bootstrapping its *litigation* strategy into standing to sue.

### 2. PETA has suffered no injury-in-fact.

Absent a direct effect—meaning "a concrete and demonstrable injury" to an organization's ordinary activities, an organization does not have standing. *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094-95 (D.C. Cir. 2015). "[A]n organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury," and that "an organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others,'" even if "doing so subjects the organization to 'operational costs beyond those normally expended.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919-20 (D.C. Cir. 2015). (original alteration; citations omitted). The Plaintiff in that case, who had sought to challenge USDA's food safety regulations, "alleged nothing more than an abstract injury to its interests that is insufficient to support standing." *Id.* at 921. As here, nothing in the challenged action limited the Plaintiff's "ability to seek redress for a violation of law" or to "restrict[] the flow of information that [the organization] uses to educate its members." *Id.* at 921. The court held that the plaintiff "has not alleged an injury to its interest" that would "give rise to organizational standing." *Id.*

When the D.C. Circuit accorded PETA standing to challenge the USDA's failure to adopt administrative regulations for birds, it did so—not because of allege "mistreatment of birds by third parties"—but because the failure to adopt regulations had damaged PETA's advocacy toolbox by preventing it from getting "redress for its complaints" and remedying "a lack of information for its membership." *USDA*, 797 F.3d at 1094-95. "PETA's alleged injuries—denial of access to bird-related AWA information including, in particular, investigatory information, and a means by which to seek redress for bird abuse—are 'concrete and specific to the work in which they are engaged,'" such that "PETA has alleged a cognizable injury sufficient to support standing." *Id.* at 1095. The agency inaction thus *directly* affected PETA's ability to perform its declared mission—as opposed to here, where PETA is challenging "mistreatment of [Lolita] by third parties," *i.e.* Seaquarium, which is firmly on the no-standing side of the Court's distinction.

Because "the only 'service' impaired is pure issue-advocacy—the very type of activity distinguished by *Havens*"—PETA cannot establish standing. *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005). That a plaintiff "cannot allocate issue advocacy expenses in any way it would prefer … is insufficient to establish standing." *Ams. for Safe Access v. D.E.A.*, 706 F.3d 438, 457-58 (D.C. Cir. 2013).

Indeed, "[t]he mere fact that an organization redirects some of its resources to litigation and legal counseling … is insufficient to impart standing." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999) (citation

omitted) [hereinafter, *ACORN*]. "An organization cannot … manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit"—because, "[w]ere we to rule otherwise, any litigant that could create injury in fact by bringing a case." *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990); *accord N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010). Although "an organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices," *ACORN*, 178 F.3d at 360; *accord Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014), "[n]ot every diversion of resources to counteract the defendant's conduct … establishes an injury in fact." *Kyle*, 626 F.3d at 238.

"An organization cannot obtain standing to sue in its own right as a result of self-inflicted injuries, i.e., those that are not 'fairly traceable to the actions of the defendant.'" *ACORN*, 178 F.3d at 358 (quoting *Bennett v. Spear,* 520 U.S. 154, 162 (1997)). "Expanding the definition of Article III injury to include an organization's litigation-related expenses implies that any sincere plaintiff could bootstrap standing by expending its resources in response to actions of another." *Id.* (citations and internal quotation marks omitted). The important distinction is whether the organization's resources have allegedly been diverted "to litigation or investigation in anticipation of litigation," which "does not constitute an injury in fact sufficient to support standing," or whether there has been "a diversion of resources to programs designed *to counteract the injury to its interest[s]*." *Equal Rights Ctr. v. Post Props, Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011) (emphasis added).

Where, as here, an organizational plaintiff is merely engaging in the same activities in which it would have engaged regardless of the litigation and cannot demonstrate that the purported diversion of resources "concretely and 'perceptibly impaired' the [organization's] ability to carry out its purpose," but rather was "simply a setback to the organization's abstract social interests" so "there is no injury in fact." *Kyle*, 626 F.3d at 238-39 (citations omitted); *accord Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78 (3d Cir. 1998) (organizational plaintiff's supposed injury from being "forced to divert resources to investigation" did not establish injury-in-fact because acts "which comprised the 'investigation' went on as part of the [organization's] normal day-to-day operations"). PETA accordingly has failed to establish injury-in-fact.

### C. Causation and Redressability.

#### 1. Causation.

The district court's truncated consideration of causation is legally flawed, in the first instance, by its premise—that "PETA has suffered actual injuries." (R:203:16). The court's causation analysis is that "[t]he diversion of resources and the conflict with PETA's mission is directly traceable to the asserted unlawful 'take' in violation of the ESA." (R:203:16). With its premise having been debunked, the causation ruling also fails. Nor did PETA otherwise show causation.

Causation is "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the

defendant." *Lujan*, 504 U.S. at 560 (citation and internal quotation marks omitted); *accord Kawa Orthodontics, LLP v. Sec'y, U.S. Dep't of Treasury*, 773 F.3d 243, 247-48 (11th Cir. 2014). PETA's failure to prove that its purported educational efforts were *required* to eliminate misimpressions as to Lolita's condition is fatal to its standing. *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 27-28 (D.C. Cir. 2011). The most that Plaintiffs can say is that Seaquarium represents its care of Lolita as humane and lawful, exactly as APHIS found it to be, and that Plaintiffs simply disagree. That disagreement does not confer standing.

**2. Redressabililty.**

The district court seems to have accepted, albeit without expressly so ruling, that PETA cannot obtain a forfeiture of Lolita or an order compelling Seaquarium to capture another wild orca as a companion animal. (R:203:16 n.15). The entirety of PETA's argument on redressability, which the district court adopted (R:203:16) was that PETA is "being forced to divert resources to counteract [Seaquarium's] take of Lolita," and requiring Seaquarium to comply with the ESA "will provide" PETA "the remedy" that will "resolve [its] injury." (R:176:9).[4] Even taking that allegation at face value, PETA cannot satisfy the *Lujan* requirement that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a

[4] The allegation is inconsistent with Kerr's declaration that PETA's injury could be alleviated only if "Lolita were provided better living conditions," including "an adequate amount of space, companions of her own species, and shelter from the sun." (R:133-14:3).

favorable decision." 504 U.S. at 247 (citation and internal quotation marks omitted).

"It is the plaintiff's burden to plead and prove … redressability." *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1266 (11th Cir. 2011) (citation omitted). Based on PETA's own assertions and public declarations, it cannot show that merely compelling ESA compliance—without moving Lolita to the requested "sea pen," shared with a (non-existent) companion orca—"would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Id.* (citation omitted). PETA certainly will not tell this Court that it will cease and desist from all actions against Seaquarium, whether in the public square or a courtroom, if it obtained that relatively minimal relief. PETA failed to demonstrate redressability.

## STATEMENT OF THE ISSUE

Whether the district court correctly ruled that there has been no "take," in violation of Section 9(a)(1)(B) of the ESA, 16 U.S.C. § 1538(a)(1)(B).

## STATEMENT OF THE CASE AND FACTS

### I. INTRODUCTION.

This case addresses the welfare and treatment of Lolita, a captive SRKW at Seaquarium's facility in Miami-Dade County. Seaquarium is licensed by APHIS, which, after its reviews in 2011 and 2012, determined that Seaquarium complied with the AWA's requirements in its treatment of Lolita. (R:203:4-5).

SRKWs in the wild have been recognized as an endangered species since 2005. (R:203:3). In 2015, the National Marine Fisheries Service (NMFS) granted

PETA's petition requesting that Lolita, despite being in captivity, be recognized as a protected SRKW. *Id.* Once ESA protection was extended to captive SKRWs, Plaintiffs brought this action, alleging that the conditions under which Lolita is maintained constitute a "take." (R:1; R:203:3).

The district court granted summary judgment for Seaquarium on the merits, ruling that Seaquarium had not violated the AWA and that Plaintiffs' alleged "harm" does not constitute a take under the ESA. (R:203:17-39). On appeal, this Court is called upon to determine whether the district court correctly applied the ESA.

## II. COURSE OF PROCEEDINGS.

Plaintiffs sued Seaquarium on July 20, 2015, seeking declaratory and injunctive relief. (R:1). Seaquarium filed a summary judgment motion on March 11, 2016, asserting: (i) Plaintiffs lack standing; and (ii) as a matter of law, Plaintiffs could not demonstrate that Seaquarium had committed a "take." (R:134; R:135). Plaintiffs filed a motion for partial summary judgment on standing. (R:131). The district court granted partial summary judgment to Plaintiffs, ruling that PETA had standing (R:203:10-16), and granted summary judgment for Seaquarium on the merits. (R:203:17-39) (the Order).[5] The district court entered final judgment on June 2, 2016, and Plaintiffs filed their notice of appeal on July 1, 2016. (R:205; R:206).

---

[5] See Statement of Jurisdiction, *supra*.

## III. STATEMENT OF FACTS.

### A. Lolita's Residence at Seaquarium.

The underlying facts are summarized in the Order:

> Lolita is a Southern Resident Killer Whale ("SRKW") that was legally captured off the coast of Washington State in 1970 when she was approximately 5 years old. Seaquarium purchased Lolita soon after her capture, and she has lived at the Seaquarium since September 24, 1970. She is now approximately 51 years of age. Her current age exceeds the median life expectancy of SRKWs.
>
> Lolita weighs about 8,000 pounds and is twenty-five feet long. For as long as she has been housed by the Seaquarium, she has lived in an oblong tank that, at its widest point, is eighty (80) feet across, and at its lowest point, is twenty (20) feet deep. Since the 1980s, the tank has been surrounded by stadium seating. For a time, Lolita shared her tank with Hugo, another SRKW. However, Hugo died in the 1980s. For the last twenty years, Lolita has shared her tank with [P]acific white-sided dolphins ("PWSDs"), who are of a biologically related species in that they are taxonomically members of the same family (i.e., the dolphin or "delphinidae" family).

(R:203:2-3) (internal citations and footnotes omitted).[6] With the exception of a SeaWorld orca, Lolita has survived longer than any orca under human care. (R:127:2; R:164:2).[7]

Lolita is healthy for an older orca. (R:203:4; R:22-7:3). Plaintiffs' veterinarian, Dr. Gallego, acknowledged that he saw no "signs of her being in bad physical condition" during a January 2016 discovery inspection. (R:127:2; R:164:2). As evidenced by a video recording, Lolita has appropriate muscle tone

[6] Lolita is actually 20 feet long. (R:173:2).

[7] Two years after Lolita was captured, Congress passed the Marine Mammal Protection Act (MMPA), which prohibits "take"—including capture—of marine mammals without a permit. 16 U.S.C. § 1372(a)(1). The MMPA has resulted in a practical moratorium on orca captures.

and unscarred skin, teeth, and eyes; she also was cooperative with trainers and veterinarians. (R:127:2-7; R:164; R:130-1).

Seaquarium's full-time veterinarian, Dr. Rodriguez, who has cared for Lolita since the late 1990s, provides a preventative medicine regime. (R:127:2; R:164). APHIS found that "[t]his whale receives excellent veterinary care." (R:22-7:3).[8]

The PWSDs are used as companion animals pursuant to rules adopted by APHIS for humane care of marine mammals exhibited in aquariums, which require a compatible companion from the "same or biologically related species." 7 U.S.C. § 2143; 9 C.F.R. § 3.101-110. Although Plaintiffs have argued that the PWSDs "rake" (scratch) Lolita with their teeth (*e.g.*, Plaintiffs' Brief at 5, 12), it is undisputed that cetaceans, including orcas and dolphins, naturally rake each other, both in the wild and in captivity. (R:203:17). APHIS found the rakes to be the "superficial" result of "normal behavior and activities," which "are promptly identified and treated." (R:203:4; R:22:3). Dr. Gallego placed Lolita as a three on a 1-10 scale for rakes. (R:203:17).

Plaintiffs have asserted that Lolita's pool is too small (Plaintiffs' Brief at 10-11), but APHIS found that the pool satisfies the AWA's orca pool-size requirements. (R:203:4-5; R:22-3; R:22-4).[9] APHIS also found that "shade and

---

[8] The parties agree Lolita has had pterygium, an irreversible eye condition, since the 1980s (approximately 30 years before the "take" prohibition was applied to Lolita in 2015). (R:127:9; R:164; R:203:18-19).

[9] Plaintiffs have demanded Lolita be "forfeited" to them for transfer to a "sea pen." (R:127; R:164). Plaintiffs propose to ship Lolita, who has been in human care for 46 years, roughly 3,000 miles to an unbuilt and unfunded "sea pen," in which Plaintiffs have no plans to provide a companion animal. *Id.* The proposed "sea

(continued . . .)

protection from weather is provided by the stadium seating around Lolita's pool, and … Lolita has none of the skin and eye lesions associated with inadequate shade." (R:203:5; R:22-7:3). The pool is also sufficiently deep "to provide [sun] protection by submerging," and "[t]here was no evidence of solar damage to the skin." (R:22-5:2). Dr. Gallego also found no evidence of sunburn during the discovery inspection, and Plaintiffs otherwise presented none. (R:127:8-9; R:164).

### B. The Summary Judgment Order.

#### 1. The district court's statutory construction analysis.

The district court ruled that, because the ESA does not specifically address treatment of captive animals—while the AWA comprehensively does so—and Congress has left that relationship between the two acts in place for 40 years, "the plain terms of the ESA, its legislative history, and its coexistence with the AWA and the MMPA," mean that an AWA-licensed exhibitor "'take[s]' a captive animal … only when its conduct gravely threatens or has the potential to gravely threaten the animal's survival." (R:203:38) (original alteration). The court reached that construction after an exhaustive review of: the ESA's statutory text; legislative history; agency interpretations; and the relationship between the AWA and the ESA. (R:203:19-37).

---

(. . . continued)
pen" (which does not meet the 100-mile-by-100-mile dimensions required by Plaintiffs' non-veterinary expert) is the first step of a plan that ends with Lolita being released to the wild. (R:127; R:164; R:203:6). Doing so would violate a rule providing that marine mammals who have been in captivity for two years or more are presumptively non-releasable. 50 C.F.R § 216.27(a)(1)(iii).

### a. The ESA's text.

The statutory definition of "take," as used in ESA Section (9)(a)(1), 16 U.S.C. § 1538(a)(1)(B), lists 10 prohibited acts: "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The district court noted that "the proscribed conduct overlaps in some respects," *e.g.*, "there is only a pedantic distinction between 'wound' and 'harm,' the former and more narrow term involving the piercing or laceration of skin and the latter, broader term involving a physical injury of some kind." (R:203:21-22) (citations and footnotes omitted). The district court accordingly applied *noscitur a sociis*, looking to the "common denominators among the terms," *i.e.*, conduct that: "constitutes seizure ('trap,' 'capture,' 'collect'); … or, has the potential to seize or gravely threaten the life of ('pursue,' 'hunt,' 'wound') a member of a listed species." (R:203:23).

The terms at issue on Plaintiffs' claims are "harm" and "harass," which the district court construed as having "the same essential character as the eight associated terms" and therefore "should be interpreted with the same level of 'impact' to the listed species as the other eight terms denote." (R:203:23).[10] The court accordingly construed "harm" and "harass" as "human conduct that amounts to a seizure or is gravely threatening, or has the potential to seize or gravely threaten the life of a member of a protected species." (R:203:25).

[10] Alternatively, the district court applied the *ejusdem generis* canon, which yields the same result, because "the more general word 'harm' appears in relation to specific terms which denote grave harm." (R:203:23).

**b. Legislative history.**

The district court also reviewed the ESA's legislative history, which "provides strong evidence that use of the terms 'harm' and 'harass' to describe a 'take' were intended to encompass only conduct amounting to a seizure, that is gravely threatening, or has the potential to seize or gravely threaten the life of an endangered species." (R:203:25). The 1973 Senate Report on the ESA "highlighted two causes of extinction the ESA was designed to reverse": "'hunting' and 'destruction of natural habitat.'" *Id.* The court also noted the statement of the House floor manager that the "principal threat to animals stems from *destruction of their habitat*" and "from those who would *capture or kill them for pleasure or profit*." (R:203:25-26) (citations omitted; emphasis by the court).

The court also relied on the ESA's "cornerstone," which "prescribes the actual designation of a species as endangered," and found that "[t]hese two causes of species extinction—habitat destruction and predation—are also reflected" in the ESA's provisions, as well as in implementing regulations, pursuant to which "a species is threatened or endangered based on any one or a combination of … [statutory] factors," including destruction of habitat, "disease or predation," and "other natural or manmade factors" that affect the species' existence. (R:203:26) (footnote omitted; quoting 16 U.S.C. § 1533(a)(1)). "[A]nalyzing the plain meaning of 'take' and its attendant verbs—harm, harass, hunt, shoot, kill, wound, capture, trap, pursue, collect—relative to the ESA's purpose in the two causes of species extinction Congress sought to counteract, it is clear that in formulating the ESA, 'harm' and 'harass' … were intended to proscribe acts … gravely

threatening, constitute the seizure of, or have the potential [to] seize or gravely threaten a member of a listed species." *Id.*

**c. Agency interpretation.**

Noting that "[d]eference to agency interpretation is … appropriate, as is the case here, where the subject being regulated is complex and requires an expertise exceeding the 'normal province of Congress,'" the district court cited a 1994 "joint policy" issued by the NMFS and Fish and Wildlife Service (FWS), which states that, "to the extent known at the time a species is listed as endangered, the agencies would address specific activities that will not be considered likely to result in a 'take.'" (R:203:27-28). The court gave particular attention to the NMFS' 2015 "comments regarding the permissible captive care activities for Lolita," particularly that, "depending on the circumstances, it would not likely find continued possession, care, and maintenance of a captive animal to be a violation of ESA section 9." (R:203:28-29). Also, "in responding to concerns regarding Lolita's care … the NMFS stated that Lolita's 'captive care requirements' are regulated by APHIS … and thus, are not within the [NMFS's] jurisdiction." (R:203:29).

"Finally, and relevant to Plaintiffs' proposed remedy in this case, the NMFS, in responding to many comments supporting Lolita's relocation to a sea pen or release into the wild, further interpreted section 9(a)(1) by stating that release of a captive animal into the wild could itself constitute a 'take.'" *Id.* Looking next to the FWS's interpretations of "'take' under the ESA in relation to the captive status of a listed species," the court noted the FWS's definition of "harass" as having "a

different character when applied to an animal in captivity than when applied to animal[s] in the wild." *Id*. (citation omitted).

"This interpretation was informed … by the purpose of the ESA as being 'best served by conserving species in the wild along with their ecosystems'—captive animals, the FWS stated, are 'removed from their natural ecosystems and have a role in survival of the species only to the extent that they maintain genetic integrity.'" *Id*. (citation omitted). "Consistent with this view, the FWS promulgated a definition of 'harass' as: 'an intentional or negligent act or omission which creates the likelihood of injury to *wildlife* by annoying it to such an extent as to significantly disrupt normal behavioral patterns … and excluded from the definition, when applied to 'captive wildlife[,] … generally accepted [a]nimal husbandry practices that meet or exceed the minimum standards for facilities and care" under the AWA. (R:203:30) (quoting 50 C.F.R. § 17.3; emphasis by the court). The court accorded deference to NMFS's statements made in the course of including Lolita in the ESA listing, and to the FWS statement in promulgation of a rule governing captive wildlife, "given the autonomy and interpretive power granted to them in implementing the ESA, the text and design of the ESA, and the validity of the statements in light of the policy objectives of the ESA." (R:203:30-31).

The agencies' interpretations "further confirm the ambit of the ESA," and "[t]hat the types of harm … the ESA was designed to safeguard against are, on the whole, distinct from concerns regarding the humane treatment and welfare of an animal in captivity." (R:203:31). Rather, "the humane treatment and welfare

standards governing Lolita's captivity are provided for in a different federal law," the AWA, to which the court turned in its final analytical step. *Id.*

**d. The ESA and the AWA.**

The court addressed "the relationship between the ESA and the AWA insofar as they both apply to animals held in captivity, particularly those trained and used for entertainment purposes." *Id.* The AWA "provides for the humane treatment of animals … use[d] … for exhibition and research purposes," *i.e.*, "unlike the ESA, it deals exclusively with captive animals, and specifically, animals that are exhibited in license facilities such as the Seaquarium." (R:203:32). The AWA is implemented by regulations and administrative enforcement—"in contrast to the ESA," because "the AWA's goals are not advanced through private causes of action." *Id.*

"In implementing the policy considerations enacted in the AWA, APHIS first established detailed regulations for the humane handling, care, treatment and transportation of marine mammals used for exhibition purposes in 1979," which standards "govern Lolita's captive care requirements at the Seaquarium." (R:203:32-33). Those regulations "address many of the types of injuries identified by Plaintiffs," including "protection from the weather *or from direct sunlight*," UV exposure, adequate enclosures, veterinary care, and companion animals. (R:203:33-34) (citations omitted; emphasis by the court). "Thus, from a wide angle, the AWA deals with a subject similar to that addressed by the ESA," but the AWA "is sharply focused on the 'humane treatment' of captive animals used for exhibition and research," which is "the overriding concern reflected in the

implementing regulations." (R:203:34). "By contrast, the ESA promotes a different congressional objective—the protection of endangered species from habitat destruction and predation." *Id.*

"[I]n the forty-plus years since their respective enactments, Congress has not disturbed this balance." *Id.* The ESA was amended numerous times, but never with any reference to "the humane treatment of captive animals," as Congress "elected not to prescribe captive care requirements in the ESA, or expand the definition of 'take' to include the humane treatment of endangered species in captivity." (R:203:36). "Instead, it left such responsibility with … APHIS." *Id.*

The court concluded that Plaintiffs' position, "if adopted … would bring the ESA into conflict with the AWA, by "displac[ing] a long established regulatory framework providing for licensing and oversight of exhibitors and researchers by APHIS," and by "expos[ing] licensed exhibitors and researchers to liability to special interest groups despite their compliance with APHIS' captive care standards." (R:203:37). It would also "substitute the judgment of a federal trial court judge for the technical expertise of the responsible agency." *Id.*

### 2. The district court's ruling on Plaintiffs' claims.

Based on this analysis, the district court ruled that a licensed exhibitor, such as Seaquarium, can be deemed to have committed a "take" of a captive animal "only when its conduct gravely threatens or has the potential to gravely threaten the animal's survival." (R:203:38). Applying that standard, the court relied on APHIS's findings that Seaquarium's care for Lolita complies with AWA humane-care rules, albeit Seaquarium "largely does not dispute that Lolita has medical

issues for which she receives treatment." (R:203:4-5, 19 & n.19).[11]

The court addressed "the conditions and consequent injuries identified by Plaintiffs":

> They fall into three categories: (a) physical and psychological injuries due to inadequate pool size and design; (b) physical and psychological injuries due to aggressive and inappropriate behavior by the PWSDs; and (c) inappropriate veterinary care. There is simply no evidence from the experts or otherwise that these conditions and concomitant injuries, individually or collectively, greatly threaten Lolita's existence. Thus, while in a literal sense the conditions and injuries of which Plaintiffs complain are within the ambit of the ordinary meaning of "harm" and "harass," it cannot be said that they rise to the level of grave harm that is required to constitute a "take" by a licensed exhibitor under the ESA.

(R:203:38) (footnote omitted). Rather, "[t]he conditions … and the injuries the Plaintiffs … presented to the Court, are largely addressed under a different federal law," the AWA. (R:203:39). Plaintiffs' remedy "is not under the ESA, but rather with Congress, where their efforts to improve Lolita's less than ideal conditions can be addressed through legislation." *Id.*

## IV. STANDARD OF REVIEW.

This Court reviews a summary judgment *de novo*, with the evidence viewed in a light most favorable to the nonmoving party. *Likes v. DHL Express (USA), Inc.*, 787 F.3d 1096, 1098 (11th Cir. 2015). The *de novo* standard also applies to statutory interpretation. *Carver Middle Sch. Gay-Straight All. v. Sch. Bd. of Lake*

---

[11] The district court did not address the admissibility of Plaintiffs' proffered expert opinion evidence of alleged injuries, because that evidence, even if admissible and accepted as true, would not support a viable claim of a "take." (R:203:18 n.18).

*Cty., Fla.*, 842 F.3d 1324, 1328 (11th Cir. 2016).

## SUMMARY OF ARGUMENT

The central question in this case is whether an AWA-licensed exhibitor of captive animals, whose care and treatment of the animal has been determined by APHIS—the agency charged with enforcement of the AWA—to be both compliant with the AWA and humane, may nonetheless be deemed to have committed a forbidden "take" of an endangered or threatened species under the ESA, absent a showing that the animal is gravely threatened by the exhibitor's care and treatment. The district court, faithfully applying statutory construction principles and deferring to the intent underlying both the AWA and the ESA, which have operated in harmony for more than 40 years, correctly declined both radically to reinvent the ESA's "take" prohibition or to step into the shoes of the responsible agency and independently review Seaquarium's care and treatment of Lolita.

Plaintiffs would have the courts construe two of the 10 terms used by the Congress to define a "take" under the ESA—"harm" and "harass"—to include virtually *any* perceived deficiency in an exhibitor's care and treatment of a captive animal, an APHIS determination that the care and treatment is AWA-compliant notwithstanding. Applying fundamental statutory construction canons, the district court correctly construed "harm" and "harass" consistently with the other eight terms that define a "take," all of which entail acts that either gravely threaten an animal's life or have the potential to do so. Because "harm" and "harass" must be construed as having the same essential character as the eight associated terms, the statutory text does not admit of the construction urged by Plaintiffs.

Moreover, if either term is legitimately subject to differing interpretations, adverting to the usual extrinsic sources—legislative history, agency construction, and the ESA's interrelationship with the AWA—yields the same result. As NMFS stated in the order that expanded SKRW-protected status to captive orcas in 2015 (which provided the jumping-off point for this action), the AWA, *not* the ESA, specifies care standards for Lolita, and "the mere continuing to hold and day-to-day care of a captive animal" is not considered a take under the ESA. As the district court correctly noted, accepting Plaintiffs' construction would make continued possession of captive endangered or threatened species members by AWA-compliant exhibitors completely untenable.

The protections accorded by the ESA should properly be invoked *only* when an exhibitor's alleged improper care or treatment rises to the level of gravely threatening (or potentially threatening) an animal's life. Because, even giving Plaintiffs' allegations full credence, the alleged injuries do not rise to that level, the district court correctly granted summary judgment for Seaquarium.

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY CONSTRUED THE ESA's DEFINITION OF "TAKE."

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 180 (1978). It has a twofold purpose: (i) "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and (ii) "to provide a program for the conservation of such … species." 16 U.S.C.

§ 1531(b). To achieve those purposes, the ESA includes "a variety of protections designed to save from extinction species that … [are] designate[d] as endangered or threatened." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 690 (1995) [hereinafter *Sweet Home*].

### A. The District Court Correctly Interpreted the Statutory Text.

Section 9(a)(1) of the ESA prohibits a "take" of a member of a listed species, 16 U.S.C. § 1538(a)(1)(B)-(C), defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). None of those terms are further defined.

The well-established meaning of "take," when Congress statutorily defined the term in enacting the ESA, was "to get possession (as fish and game) by killing or capturing"—actions that necessarily end or severely affect the life of the animal. Webster's Third New Int'l Dictionary (1961). In listing the 10 actions that can constitute a "take" under the new statutory definition, Congress intended to outlaw "every conceivable *way*" one might "take" an animal. S. Rep. No. 93-307 (1973), *as reprinted in* U.S.C.C.A.N. 2989, 2995 (emphasis added). That stated intent demonstrates that Congress was fully aware of what a "take" is, and accordingly focused the statutory definition on plugging potential loopholes by prohibiting all means of committing a "take," rather than prohibiting actions that do not *substantially impact* wildlife. *Sweet Home*, 515 U.S. at 696-99, 726 (citing Senate Report).

#### 1. Interpreting the language.

The two terms at issue here are "harm" and "harass," which Plaintiffs argue

should be read in the "broadest possible terms." *E.g.*, Plaintiffs' Brief at 22-23. But, as the district court recognized, "[w]hile the ESA's purpose is 'broad,' construing statutory language is not merely an exercise in ascertaining 'the outer limits of [a word's] definitional possibilities.'" (R:203:22) (original alteration; internal citation omitted) (citing *Dolan v. Postal Serv.*, 546 U.S. 481, 486 (2006)). Rather, because "this is a statutory interpretation case," an "[a]nalysis of the statutory text, aided by established principles of interpretation, controls." *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2236 (2014).

The district court correctly invoked the principle that a court should not "interpret the relevant words … in a vacuum, but with reference to the statutory context, structure, history, and purpose." (R:203:21) (internal quotation marks omitted) (quoting *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014)). Looking first to "statutory context," the Supreme Court has recognized that there is considerable overlap among the 10 definitions of "take," which "reflects the [ESA's] broad purpose." *Sweet Home*, 515 U.S. at 698 n.11; *accord Endangered & Threatened Wildlife & Plants; Final Redefinition of "Harm,"* 46 Fed. Reg. 54748 (Nov. 4, 1981) (because "[i]t is obvious that there is considerable overlap in many of these terms … it would be a fruitless and impractical exercise to attempt to define any one of these terms to the exclusion of the others so as to have no overlap of prohibited actions").[12] The district court took note: "[f]or example, there is no meaningful difference between the terms 'trap' and 'capture'; and, there

[12] For an analysis of administrative interpretations, see Point II.B.2, *infra*.

is only a pedantic distinction between 'wound' and 'harm,' the former and narrow term involving the piercing or laceration of skin, and the latter, broader term involving a physical injury of some kind." (R:203:22) (footnotes and citations omitted). That being so, the district court correctly invoked *noscitur a sociis* to construe "harm" and "harass." (R:203:22-23).

**2. *Noscitur a sociis.***

*Noscitur a sociis* is "the commonsense principle that statutory terms, ambiguous when considered alone, should be given related meaning when grouped together." *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1247 (11th Cir. 2008). Stated otherwise, "a word is known by the company it keeps." *McDonnell v. United States*, 136 S. Ct. 2355, 2368 (2016) (citation omitted). It is "often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Id.* (citation omitted).

The district court construed "harm" and "harass" in context:

> Here, the common denominators among the terms are conduct that: constitutes seizure ("trap," "capture," "collect"); is gravely threatening ("kill," "shoot"); or, has the potential to seize or gravely threaten the life of ("pursue," "hunt," "wound") a member of a listed species. The remaining terms "harm" and "harass" should, therefore, have the same essential character as the eight associated terms. Or put another way, as Seaquarium argues, "harm" and "harass" should be interpreted with the same level of "impact" to the listed species as the other eight terms denote.

(R:203:23).[13] The district court's construction of "harm" and "harass" is consistent

---

[13] The district court noted that *ejusdem generis* "yields the same result," because "the more general word 'harm' appears in relation to specific terms which denote *grave* harm: 'cause the death of a (person, animal, or other living thing)' ('kill'); (continued . . .)

with the only Court of Appeals decision to have construed either term in an analysis of a "take" prohibition. *United States v. Hayashi*, 22 F.3d 859, 864 (9th Cir. 1993).

In *Hayashi*, upon which the district court relied (R:203:24), the court read "harass," as used in the definition of "take" in the MMPA, to require *significant* adverse impact—indeed, a "direct intrusion" on wildlife, because the other components of the MMPA "take" definition ("hunt, capture, or kill") certainly did so. 22 F.3d at 864 (citing 16 U.S.C. § 1362 (1992)).[14] The court accordingly held that firing a gun near—but not at—a dolphin, to discourage it from eating fish hooked on fishermen's lines, was not "harass[ment]" as a matter of law, and therefore was not a "take." *Id.*[15]

The Supreme Court's recent *McDonnell* decision validates the court's

(. . . continued)
'pursue an animal in order to kill or for sport' ('hunt'); 'kill or wound (a person or animal) with a bullet…' ('shoot'); and, 'to follow someone or something in order to catch or attack them' ('pursue')." (R:203:23-24) (internal citations omitted). "[G]eneral words or principles, when appearing in conjunction with particular classes of things, will not be considered broadly, but rather will be limited to the meaning of the more particular and specific words." *Doe v. Naval Air Station, Pensacola, Fla.*, 768 F.2d 1229, 1232 (11th Cir. 1985).

[14] When *Hayashi* was decided, the MMPA (like the ESA) "fail[ed] to define 'harass'" in the definition of "take." *Hayashi,* 22 F.3d at 861. Congress amended the MMPA specifically to define "harass," 16 U.S.C. § 1362 (2003), such that "harass" under the ESA is now more narrow than "harass" under the MMPA. *Special Rule for the Polar Bear*, 73 Fed. Reg. 76249, 76251 (Dec. 16, 2008).

[15] As Plaintiffs note (Plaintiffs' Brief at 31-32), *Sweet Home* distinguished *Hayashi* in addressing indirect and direct harm, but *Hayashi* is persuasive insofar as it correctly analyzes the degree of impact that must be shown to constitute harassment (and by logical extension, harm). 515 U.S. at 702 n.16.

analysis. The defendant was charged with honest-services fraud for accepting benefits, while serving as Virginia's governor, in exchange for an "official acts," *i.e.*, "arranging meetings" for a constituent, "'hosting' events," and "contacting other government officials." 136 S. Ct. at 2361. The bribery statute required the government to identify a "question, matter, cause, suit, proceeding or controversy" that "may at any time be pending" or "may by law be brought" before a public official, as the first element of an "official act." 18 U.S.C. § 201(a)(3).

Addressing "whether a typical meeting, call, or event is itself a 'question, matter, cause, suit, proceeding or controversy,'" the Supreme Court rejected the government's position that "nearly any activity by a public official qualifies as a question or matter—from workaday functions, such as the typical call, meeting, or event, to the broadest issues the government confronts, such as fostering economic development," ruling that the statutory language "do[es] not sweep so broadly." *McDonnell*, 136 S. Ct. at 2368. Instead, the Court looked to "[t]he last four words in that list—'cause,' 'suit,' 'proceeding,' and 'controversy'—[which] connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination." *Id.* "Although it may be difficult to define the precise reach of those terms, it seems clear that a typical meeting, telephone call, or event arranged by a public official does not qualify as a 'cause, suit, proceeding or controversy.'" *Id.* But "'question' could also mean any 'subject or aspect that is in dispute, open for discussion, or to be inquired into,' and a 'matter' any 'subject' of 'interest or relevance.'" *Id.* (citing Webster's Third New Int'l Dictionary (1961)). Those meanings would turn "a typical meeting, call, or event" into a "question" or

"matter" under the statute. *Id.*

Both terms can also be read "more narrowly," such that "question" would mean "a subject or point of debate or a proposition being or to be voted on in a meeting," and "matter" would mean "a topic under active and usually serious or practical consideration." *Id.* (citing Webster's). "To choose between those competing definitions," the Court "look[ed] to the context in which the words appear," to "conclude that a 'question' or 'matter' must be *similar in nature* to a 'cause, suit, proceeding or controversy.'" *Id.* at 2369 (emphasis added). "Because a typical meeting, call, or event arranged by a public official is not of the same stripe as a lawsuit before a court, a determination before an agency, or a hearing before a committee, it does not qualify as a 'question' or 'matter' under § 201(a)(3)." *Id.*

Similarly, in *Yates v. United States*, 135 S. Ct. 1074 (2015), the Supreme Court held that a "tangible object" as used in the Sarbanes-Oxley Act, does not include a fish, even though a fish is—literally—a tangible object, because that term is used in association with "document" and "record," and thus refers to storage media, e.g., a hard drive. 135 S. Ct. at 1081, 1085-87. The Court emphasized that, while dictionary definitions "bear consideration, they are not dispositive" when context counsels a narrow reading. *Id.* at 1082-83.

*McDonnell* and *Yates* are controlling: "harm" and "harass," even if open to other meanings, must be construed consistently with "pursue, hunt, shoot, wound, kill, trap, capture or collect"—precisely as the district court construed them. (R:203:22-23). Just as "question" or "matter" could not be broadly construed, so

as to have their colloquial or quotidian sense, "harm" and "harass" cannot be so construed. *McDonnell* establishes that the district court got it exactly right.[16]

### 3. *Sweet Home.*

Plaintiffs' primary argument is that the district court's interpretation is nonetheless foreclosed by the *Sweet Home* decision—and, indeed, they go so far as to accuse the district court of "join[ing] the *Sweet Home* dissent in its 'selective foray' through the ESA's legislative history, redefining 'harm' and 'harass' to require a 'grave threat' or 'seizure' of an animal." Plaintiffs' Brief at 22-25 (citations and emphasis omitted). The district court did nothing of the kind. The irony here is that *Sweet Home* fully *supports* the district court's analysis.

In *Sweet Home*, the plaintiffs sought a declaratory judgment to overturn an Interior Department regulation that defined "harm" under the ESA as "an act which actually kills or injures wildlife," including "significant habitat modification or degradation [that] actually kills or injures wildlife by significantly impairing essential behavioral patterns." 515 U.S. at 691 (quoting 50 C.F.R. § 17.3). The plaintiffs asserted that the regulation should have been "limited … to direct applications of force against protected species," *i.e.*, to "direct or willful action that

---

[16] And, as the district court correctly stated, the *noscitur a sociis* canon "becomes even more pertinent when the proscribed conduct, like the term 'take' in the ESA section 9(a)(1), is defined with a list of overlapping words." (R:203:22-23) (citing *United States v. Costello*, 666 F.3d 1040, 1046 (7th Cir. 2012) ("[w]hen a statute is broadly worded in order to prevent loopholes from being drilled in it by ingenious lawyers, there is a danger of its being applied to situations absurdly remote from the concern of the statute's framers" (citations omitted))). Plaintiffs mistake Congress' intent to outlaw all ways by which one might *commit* a "take" as intended to outlaw any human-caused *impact* on any protected animal.

leads to injury." *Id*. at 697-98.

The Supreme Court rejected that challenge, relying on a dictionary definition of "harm"—"to cause hurt or damage"—which, "[in] *the context of the ESA*, … naturally encompasses habitat modification that results in *actual injury or death* to members of an endangered or threatened species." *Id*. at 697 (emphasis added). The Court noted that "the dictionary definition does not include the word 'directly' or suggest in any way that only direct or willful action that leads to injury constitutes 'harm.'" *Id*. "Moreover, unless the statutory term 'harm' encompasses indirect as well as direct injuries, the word has no meaning that does not duplicate the meaning of other words that § 3 uses to define 'take.'" *Id*. at 697-98. The Court reversed the Court of Appeals' application of *noscitur a sociis* "to give 'harm' essentially the same function as other words in the definition, thereby denying it independent meaning." *Id*. at 701-02.

But the Court was careful to uphold a construction of "harm" that is entirely *consistent* with other definitions of "take." First, the Court noted that "[s]everal of the words that accompany 'harm' in the § 3 definition of 'take,' especially 'harass,' 'pursue,' 'wound,' and 'kill,' refer to actions that do not require direct applications of force." *Id*. at 701. And the Court reaffirmed the proper role for *noscitur a sociis* to play in analyzing Section 3—which speaks directly to the district court's analysis in this case.

The Court reiterated that "[t]he canon … counsels that a word gathers meaning from the words around it." *Id*. at 702 (citation and internal quotation marks omitted). The Court applied the canon to hold that indirect harm is

included:

> The statutory context of "harm" suggests that Congress meant that term to serve a particular function in the ESA, *consistent with*, but distinct from, the functions of the other verbs used to define "take." The Secretary's interpretation of "harm" to include indirectly injuring endangered animals through habitat modification permissibly interprets "harm" to have "a character of its own not to be submerged by its association."

*Id*. at 702 (emphasis added; citation omitted).

Because, as noted earlier, *Sweet Home* involved a direct *facial* challenge to a regulation, the ultimate question was merely whether the Secretary had acted reasonably in promulgating the regulation, a question that was addressed with deference to agency's expertise. *Id*. at 703-04 ("[t]he latitude the ESA gives the Secretary in enforcing the statute, together with the degree of regulatory expertise necessary to its enforcement, establishes that we owe some degree of deference to the Secretary's reasonable interpretation"). The Supreme Court noted that the plaintiffs in that case had "advance[d] strong arguments that activities that cause minimal or unforeseeable harm will not violate the [ESA] as construed" in the Interior Department's "'harm' regulation." *Id* at 699. The breadth of the challenge, however, foreclosed any need for the Court to address the regulation's proper *scope*— because the plaintiffs' "facial challenge to the regulation" sought to "invalidate the Secretary's understanding of 'harm' in every circumstance, even when an actor knows that an activity, such as draining a pond, would actually result in the extinction of a listed species by destroying its habitat." *Id*. at 699-700. Holding only that, "[g]iven Congress' clear expression of the ESA's broad purpose

to protect endangered and threatened wildlife, the Secretary's definition of 'harm' is reasonable," *id*. at 700, the Court had no occasion to address whether regulations defining "harm" could lawfully be construed to include "minimal or unforeseeable harm" being deemed a "take."

Here, the district court was called upon to construe a regulation that, as urged by Plaintiffs, would treat any alleged lapse in the ordinary care and treatment of a captive animal by an AWA-licensed exhibitor whose care and treatment has been approved by APHIS as a take. The Court accordingly reached the question left open in *Sweet Home*. But, because the Court held that "harm" in the definition of "take" should be construed to avoid immunizing the "grave result" of man-made "detrimental[] chang[e] [of] natural habitat," resulting in "members of those species [being] killed or injured," *id*. at 696, the district court's construction is entirely consistent with *Sweet Home*. By requiring a "grave[]" threat to the animal's survival for there to be a "take" of an exhibited animal receiving humane AWA-compliant care (R:203:38), the district court reached the unforeseeable-harm issue left open in *Sweet Home*, heeding the Court's acknowledgement that there are "strong arguments" why "minimal or unforeseeable harm" cannot be deemed a "take," *id*. at 699-700, and correctly interpreting "harm" and "harass" in context.

### B. The District Court's Construction Is Consistent with ESA's Legislative History and Administrative Interpretations of "Take."

#### 1. Legislative history supports the court's interpretation of "harm" and "harass."

After reviewing the ESA's legislative history, the district court concluded that, "analyzing the plain meaning of 'take' and its attendant verbs—harm, harass,

hunt, shoot, kill, wound, capture, trap, pursue, collect—relative to the ESA's purpose and the two causes of species extinction Congress sought to counteract, it is clear that in formulating the ESA, 'harm' and 'harass' … were intended to proscribe acts gravely threatening, constitute the seizure of, or have the potential [to] seize or gravely threaten a member of a listed species." (R:203:25-26). If there is any ambiguity as to whether the common meaning of "harm" and "harass"—as opposed to the district court's contextual reading—should be applied, the legislative history requires the contextual approach.

It is a familiar principle that, "[w]hen ambiguity in a statute renders congressional intent unclear," such that a court is unable to discern such intent from the plain meaning of other statutory text, "it is appropriate to resort to extrinsic aids such as legislative history." *Lowery v. Ala. Power Co.,* 483 F.3d 1184, 1205 (11th Cir. 2007); *accord U.S. Steel Mining Co. v. Dir., OWCP*, 719 F.3d 1275, 1283 (11th Cir. 2013). The history is pellucid.

The 1973 Senate Report on the ESA stresses that the act was designed to reverse two "causes of *extinction*"—"hunting and destruction of natural habitat." S. Rep. No. 93-307, 2990 (emphasis added). The Supreme Court, in analyzing the ESA in *Sweet Home*, noted the comments of Senator Tunney, who stressed that "most endangered species are threatened primarily by the destruction of their natural habitats." 515 U.S. at 706 n.19 (quoting 119 Cong. Rec. 25669 (1973)). The Supreme Court also cited the remarks of the House floor manager, to the effect that the "principal threat to animals stems from destruction of their habitat" and "from those who would capture or kill them for pleasure or profit," as to which the

floor manager added: "we certainly can make it less profitable for them to do so." *Id*. (quoting same source).

The district court then turned to the ESA's "cornerstone":

> These two causes of species extinction—habitat destruction and predation—are also reflected in the cornerstone of the Act, section 4, which prescribes the actual designation of a species as endangered. 16 U.S.C. § 1533(a)(1). Pursuant to the ESA and its implementing regulations, a species is threatened or endangered based on any one or a combination of the following section 4(a)(1) factors: "the present or threatened destruction, modification, or curtailment of its habitat or range; overutilization for commercial, recreational, scientific or educational purposes; disease or predation; … inadequacy of existing regulatory mechanisms; or other natural or manmade factors affecting [the species'] existence."

(R:203:26) (original alteration). The district court correctly ruled that "the legislative history accompanying the ESA provides strong evidence that use of the terms 'harm' and 'harass' to describe a 'take' were intended to encompass only conduct amounting to a seizure, that is gravely threatening, or has the potential to seize or gravely threaten the life of an endangered species." (R:203:25-26).

**2. The district court correctly relied on agency interpretations.**

When "statutory language is ambiguous," the courts will "defer to [an agency's] consistent and well-reasoned interpretation" of the language. *Serrano v. U.S. Attorney Gen.*, 655 F.3d 1260, 1266 (11th Cir. 2011). Contrary to Plaintiffs' assertions (Plaintiffs' Brief at 32-40), agency decisions construing the "take" prohibition and its relationship to AWA standards defining humane care of captive animals support the district court's determination that an exhibitor's provision of AWA-compliant (and thus "humane") care is not a "take." (R:203:27-37).

First, the NMFS—which, as a division of the National Oceanic and Atmospheric Administration, is charged with implementing regulations to protect threatened or endangered marine species under the ESA, 50 C.F.R. § 222.101(a)—has defined "harm" as " an act which *actually kills or injures* fish or wildlife." 50 C.F.R. § 222.102 (emphasis added). In giving exemplars, NMFS returned to that core definition: "[s]uch an act may include significant habitat modification or degradation *which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns*, including, breeding, spawning, rearing, migrating, feeding or sheltering." *Id.* (emphasis added).

NMFS adhered to this definition in promulgating the very rule requested by PETA to include Lolita under the ESA and implementing regulations. *Amendment to the Endangered Species Act Listing of the Southern Resident Killer Whale Distinct Population Segment*, 80 Fed. Reg. 7380 (Feb. 10, 2015) [hereinafter *Final Rule*]. NMFS stated that what constitutes a "take" should be decided on an individual basis, because "depending on the circumstances, we would *not* likely find continued possession, care, and maintenance of a captive animal to be a violation of section 9." *Id.* at 7389 (emphasis added). As NMFS officials explained in announcing the rule:

> If Miami Seaquarium was looking to move [Lolita], transfer her, or certainly if there were any interest in…release that would certainly have to be looked at and looked at in terms of a take issue. *But the mere continuing to hold and day-to-day care of a captive animal is not considered a take under the Endangered Species Act.*

(R:130-1:Ex.10 Timestamp 25:30) (emphasis added).

NMFS's statements are entirely consistent with formal precedent of the FWS, an agency within the Interior Department that is responsible for implementing the ESA for land-based species and some aquatic species, 50 C.F.R. § 17.1(a), and thus for the vast majority of ESA-protected species exhibited in zoos and aquariums. *Captive-bred Wildlife Reg.,* 63 Fed. Reg. 48634, 48636 (Sept. 11, 1998). The FWS defines "harm" under the ESA identically with the NMFS's definition. 50 C.F.R. § 17.3 ("an act which actually kills or injures wildlife … by significantly impairing essential behavioral patterns").

The FWS has also promulgated a definition of "harass" under the ESA: "an intentional or negligent act or omission which creates the *likelihood of injury to wildlife by annoying it* to such an extent as to significantly disrupt normal behavioral patterns." 50 C.F.R. § 17.3 (emphasis added).[17] NMFS has not defined "harass," but paralleled FWS's approach in discussing what could constitute "take" of Lolita in *Final Rule*, and has cited the FWS definition as persuasive. *See Strahan v. Roughead*, 910 F. Supp. 2d 358, 366 (D. Mass. 2012).[18]

FWS has also rejected Plaintiffs' contention (Plaintiffs' Brief at 33) that the "take" prohibition must be implemented identically for both wild and captive animals and that *any* disruption of wild behaviors from captivity is a "take":

---

[17] FWS subsequently ruled that "likelihood of injury" requires more than a "potential" for injury. *Special Rule for Polar Bear*, 73 Fed. Reg. 76249, 76251 (Dec. 16, 2008); *see In re Polar Bear Endangered Species Act Listing & § 4(d) Rule Litig.*, 818 F. Supp. 2d 214, 223-28 (D.D.C. 2011) (upholding quoted ruling).

[18] Plaintiffs agree that "NMFS has favorably cited FWS' definition of 'harass,'" in a ruling that is cited in the *Strahan* order. Plaintiffs' Brief at 9.

> [T]he definition of 'take' in the Act clearly applies to individual specimens or groups of specimens, and the captive or non-captive status of a particular specimen is a significant factor in determining whether particular actions would "harass" that specimen … .
>
> To decide otherwise would place those persons holding captive specimens of a listed species in an untenable position. If providing for the maintenance and veterinary care of a live animal were considered to be "harassment," those persons holding such specimens in captivity would be forced to obtain a permit or give up possession since *any failure to provide proper maintenance and care would be an unlawful "taking*." Since Congress chose not to prohibit the mere possession of lawfully-taken listed species in Section 9(a)(1) of the Act, [FWS] believes that congressional intent supports the proposition that measures necessary for the proper care and maintenance of listed wildlife in captivity do not constitute "harassment" or "taking."

*Captive-bred Wildlife*, 63 Fed. Reg. at 48636 (emphasis added).

The district court correctly treated NMFS's *Final Rule* and FWS's *Captive-bred Wildlife* rule as persuasive and entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (agency interpretations and opinions "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance"). (R:203:30-31). "The weight of deference afforded to agency interpretations under *Skidmore* depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (quoting *Skidmore,* 323 U.S. at 140); *accord EEOC v. Catastrophe Mgmt. Sols.*, No. 14-13482, 2016 WL 7210059, at *10 (11th Cir. Dec. 13, 2016). NMFS and FWS rulings and interpretations of the ESA have the requisite "power to persuade," and serve only further to buttress the district court's construction.

The district court's construction of "harm" and "harass" is completely consistent with definitions promulgated—and used on a regular basis—by NMFS and FWS. The court appropriately relied on the agencies' "consistent and well-reasoned interpretation[s]" of the two terms, *Serrano*, 655 F.3d at 1266, further to support its correct textual analysis.

## II. THE DISTRICT COURT CORRECTLY HARMONIZED THE ESA AND AWA IN GRANTING SUMMARY JUDGMENT.

### A. Overview.

Once "harm" and "harass" are given their proper due, the only remaining question is whether the district court correctly applied the standard to the facts presented by the parties on summary judgment. But that ruling must first be seen in its proper light.

Plaintiffs assert that "disputed facts remain with respect to … the conditions under which Lolita is maintained, including their compliance with the AWA, and … the existence and severity of Lolita's physical injuries," and also "as to remedy." Plaintiffs' Brief at 51. But the district court did *not* resolve the question whether such factual disputes existed, much less did it attempt to harmonize disputed facts. Rather, the court *assumed* the accuracy of Plaintiffs' proffered injuries—its doubts about the expert testimony offered in support notwithstanding (R:203:17-19 & n.18, 38 n.27)—and applied its construction of "take" under the ESA "to the *injuries identified by PETA*." (R:203:19) (emphasis added).

Following the lengthy legal analysis (as discussed in Point I, *supra*), the court stated that it had "thoroughly considered the conditions and consequent

injuries identified by Plaintiffs" and—based on APHIS's findings that Seaquarium is providing Lolita with humane care (R:203:4-5, 38)—concluded:

> There is simply no evidence from the experts or otherwise that these conditions and concomitant injuries, individually or collectively gravely threaten Lolita's existence. Thus, while in a literal sense the conditions and injuries of which Plaintiffs complain are within the ambit of the ordinary meaning of 'harm' and 'harass,' it cannot be said that they rise to the level of grave harm that is required to constitute a 'take' by a licensed exhibitor under the ESA.

(R:203:38). Because a contrary construction of "take" "would displace a long established regulatory framework providing for licensing and oversight of exhibitors and researchers by APHIS, it would expose licensed exhibitors and researchers to liability to special interest groups despite their compliance with APHIS' captive care standards, and would substitute the judgment of a federal trial court judge for the technical expertise of the responsible agency." (R:203:37).

The only remaining questions for this Court are: (i) whether the district court correctly ruled that "humane" treatment of a captive animal by an AWA-licensed exhibitor is not, as a matter of law, a "take" under the ESA, absent a grave threat to the animal's existence (which likely would be inhumane treatment); and (ii) if so, then whether APHIS's findings should control on whether a captive animal is receiving "humane" treatment.

### B. The District Court Correctly Harmonized the ESA and AWA.

The "gravely threatens" standard articulated by the district court avoids conflict between the ESA and AWA on animal-care issues by providing an objective safety valve that is triggered when medical evidence establishes a grave

threat to the animal. (R:203:38). For example, Plaintiffs' non-veterinarian expert, Dr. Visser, testified that a proper orca pool must be 100 *miles* wide, by 100 *miles* long, by 300 meters deep. (R:168:Ex.D:44-46).[19] APHIS, however, found that Lolita's pool complies with AWA's pool-size standard. (R:203:5). There would be no end to zoo-related litigation if ideological "take" arguments—like Dr. Visser's—were enough to hold AWA-compliant licensee in violation of the ESA. See Amicus Sea Shepard Brief at 25 ("[c]aptivity is immoral in all circumstances").

Contrary to Plaintiffs' assertions, neither the FWS and NMFS rulings, nor the Order, offer protection to a zoo or aquarium whose care APHIS has found to be seriously non-compliant with AWA standards, and thus *not* "humane." 7 U.S.C. § 2143. The AWA standards define "humane" care, and FWS has ruled that inhumane care is likely a "take." *Captive-bred Wildlife*, 63 Fed. Reg. at 48638. Thus, the "gravely threatened" test for a "take" is premised on AWA compliance. (R:203:38). As the district court noted, the "overriding concern" of the AWA and the AWA care standards, 7 U.S.C. §§ 2131, 2143, is to ensure exhibitors provide *humane* care. (R:203:34).

That ruling is supported by FWS's close linking of the ESA "take" prohibition to the AWA standards defining "humane" care for captive wildlife exhibited to the public, *i.e.*, the ESA continues to afford protection to species that

[19] That would be a 10,000 square mile "pool"—approximately the size of Vermont. Enchanted Learning, *U.S. States (plus Washington D.C.): Area & Ranking*, www.enchantedlearning.com/usa/states/area.shtml (last visited Feb. 9, 2017).

"are not being treated in a *humane* manner." *Captive-bred Wildlife*, 63 Fed. Reg. at 48638 (emphasis added).[20] FWS declined to perform a species-by-species determination of what is humane animal husbandry, rather than "take" by "harass[ment]," explaining that APHIS had already adopted species-by-species animal husbandry standards under the AWA. *Id.* Instead, FWS adopted a rule defining "harass" in "take" to generally *exclude* AWA-compliant care of "captive wildlife," using "[a]nimal husbandry practices that meet or exceed the minimum standards for facilities and care under the [AWA]." 50 C.F.R. § 17.3. FWS also required a "likelihood of injury" for there to be a "take." *Id.* Similarly, FWS, in *Captive-bred Wildlife*, found that proper care and maintenance measures are not "'harassment' *or* '*taking*.'" 63 Fed. Reg. at 48636 (emphasis added).

Plaintiffs assert that the district court "adopted its novel 'grave threat' standard due, in part, to a perceived need to reconcile the protections of the ESA with those of the AWA." Plaintiffs' Brief at 41-51. But that argument ignores Congressional directives for coordination of the ESA and the AWA. The ESA provides that:

> Nothing in this chapter … shall be construed as superseding or limiting in any manner the functions of the Secretary of Agriculture under any other law relating to prohibited or restricted importations *or possession* of animals … and no proceeding or determination under this chapter shall preclude any proceeding or be considered

[20] In announcing the previously cited rule that applies the ESA to Lolita, NMFS officials stated that the AWA governs "pool-size" and other "basic care elements" for "captive holding." (R:130-1:Ex.10 Timestamp 26:30). "[T]he [AWA] is what specifies the [care] standards for captive animals. The [ESA] does not do that." (R:130-1:Ex.10 Timestamp 29:30).

> determinative of any issue of fact or law in any proceeding under any Act administered by the Secretary of Agriculture.

16 U.S.C. § 1540(h) (emphasis added). Because ESA proceedings cannot "limit[]" USDA "functions" regarding "possession" of animals and shall not "be considered determinative of any issue of fact or law" in any subsequent USDA proceeding, Section 1540(h) gives the AWA precedence.

It thus makes particular sense for FWS to construe the ESA "take" standard as adhering to the AWA "humane" care standard. Indeed, Section 1540(h)'s legislative history shows that Congress, in enacting the ESA, sought "coordination" between FWS/NMFS and USDA as to several areas of joint concern, as well as "*other possibly overlapping areas*," which would include care for captive members of endangered species exhibited pursuant to the AWA. S. Rep. No. 93-307, 2999 (emphasis added).[21]

The AWA also requires coordination of overlapping statutes, including the ESA, in directing USDA to "consult … with other Federal departments …

---

[21] Plaintiffs rely on *Endangered & Threatened Wildlife & Plants; Revision of the Section 4(d) Rule for the African Elephant (Loxodonta africana)*, 81 Fed. Reg. 36388, 36388 (June 16, 2016) (final rule), to argue that FWS now construes "take" *without* reference to AWA standards. Plaintiffs' Brief at 38-39. Although FWS imposed a "take" prohibition in that decision, to ensure that the captive elephants "received an appropriate standard of care," FWS also referred to an earlier proposed rule for the governing AWA standard. *Endangered & Threatened Wildlife & Plants; Revision of the Section 4(d) Rule for the African Elephant (Loxodonta africana)*, 80 Fed. Reg. 45154, 45161 (July 29, 2015) (proposed rule; rule adopted "to ensure that elephants held in captivity receive an appropriate standard of care"; "[a]ny activities that qualify as take, including those *beyond* the standard veterinary care, breeding procedures, and AWA care standards described in the definition of harass" would be prohibited without permit).

concerned with the welfare of animals used for … exhibition … when establishing [AWA animal care] standards." 7 U.S.C. § 2145(a). Accordingly, in adopting the AWA standards governing orca exhibits, including pool size, companionship, and shading, USDA considered the comments of the NMFS, FWS, and the Marine Mammal Commission (MMC). *Marine Mammals; Humane Handling, Care, Treatment, and Transportation*, 44 Fed. Reg. 36868, 36868 (June 22, 1979). Further, USDA worked closely with NMFS, FWS, and MMC in developing marine mammal care standards, and its publication of those standards (which USDA adopted in 1979) "marked the culmination of 5 years of cooperative work by the [FWS], the NMFS, the APHIS, and [MMC]." 1977-1978 FWS MMPA Ann. Rep. at 4-5.

This close relationship—of more than 40 years standing—between the ESA and the AWA cannot be undone by application of the Supreme Court's *Pom Wonderful* decision, as Plaintiffs would have the Court do. Plaintiffs' Brief at 44-50. That case addressed whether the Food, Drug, and Cosmetic Act (FDCA) precludes a Lanham Act claim challenging a misleading food label, and Plaintiffs mistakenly attempt to analogize the Court's holding to the interaction between the ESA and the AWA. Plaintiffs' Brief at 45.

Plaintiffs are incorrect. First, the Supreme Court emphasized in *Pom Wonderful* that there is *no* relationship between the FDCA and the Lanham Act, the former having been enacted to protect consumer "health and safety," and the latter to allow private parties to bring for unfair-competition-claims. 134 S. Ct. at 2241. Second, Coca-Cola argued that the FDCA regulations "preclude[d] POM's

Lanham Act claim." *Id.* at 2239. Here, the district court merely utilized the APHIS findings to support its rulings that Seaquarium was not committing a "take," and thus, followed the agencies' policies in coordinating the ESA and AWA. (R:203:38).

Third, *Pom Wonderful* directly invoked the Lanham Act's core purpose (preventing unfair competition from deceptively labeled products), and at most tangentially impacted the FDCA's consumer "health and safety" interests. 134 S. Ct. at 2233-34, 2241. By contrast, the ESA's purpose—to prevent species extinction by habitat destruction and predation—is, at most, tangentially implicated by a case involving care of a captive animal under 16 U.S.C. § 1531. (R:203:34-36). And the AWA is "sharply focused" on care for captive exhibited animals, which is the core issue in this case. (R:203:34). Plaintiffs' invocation of *Pom Wonderful* provides no support for their argument, and the district court's careful harmonization of the ESA and AWA should be upheld.

### C. The District Court Correctly Relied on APHIS's Findings.

Seaquarium has kept Lolita alive for 46 years and, at 51, Lolita has outlived the median wild orca lifespan. (R:203:2). As the district court noted, "Seaquarium largely does not dispute that Lolita has medical issues for which she receives treatment." (R:203:19). Although Plaintiffs "proffered evidence, through purported expert testimony," of 13 alleged injuries (R:203:17-18), and argue additional alleged injuries to this Court (Plaintiffs' Brief at 52-55), the fundamental question remaining is whether, as a matter of law, treatment of a captive animal that APHIS has approved as humane and AWA-compliant can *ever* constitute a

"take" under the ESA.[22] The district court answered that question with its construction of "harm" and "harass," as has been set forth, and then declined to second-guess APHIS's expertise. (R:203-37).

Plaintiffs nonetheless contend that Lolita has "frequent infections, likely ulcers, possible lung disease, anemia and kidney disease," and openly question the accuracy of APHIS's finding that Seaquarium's care of Lolita is AWA-complaint. Plaintiffs' Brief at 52, 55-57. The district court correctly refused to go behind APHIS's findings.

APHIS's permitting decisions are subject to review only under 5 U.S.C. § 706(2), the APA's narrow judicial-review provision, *e.g., Ctr. for Biological Diversity v. APHIS*, No. 10-14175, 2011 WL 4737405, at *2 (S.D. Fla. Oct. 6, 2011), which requires reviewing courts to afford great deference to administrative decisions. *E.g., Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) ("standard is exceedingly deferential" (citation omitted)). Plaintiffs cannot be granted more sweeping review of an agency's decision by ignoring the APA and

---

[22] In acknowledging that there might be exceptional situations where an AWA-licensed exhibitor providing humane care might nevertheless be committing an ESA-prohibited "take" when engaging in conduct that "gravely threatens" an animal (R:203:26, 38), the district court both cabined its ruling and safeguarded the coordination between the ESA and the AWA. *See Kuehl v. Sellner*, 161 F. Supp. 3d 678, 709-19 (N.D. Iowa 2016), *appeal pending* (8th Cir. No. 16-1624) (cited in Plaintiffs' Brief at 28) (APHIS repeatedly cited zoo for serious AWA violations; court relied on APHIS findings to determine "take" had occurred). *See also* Order at 4-5, *Graham v. San Antonio Zoological Society,* No. 5:15-cv-1054-XR (W.D. Tex. Jan. 27, 2016), ECF No. 16 (whether ESA "take" claim regarding zoo elephant could go forward depends on AWA compliance).

attempting to open the decision to *de novo* review.[23]

Nor, for that matter can Plaintiffs ask this Court to step into the district court's shoes and determine, in the first instance, whether there are factual disputes under their version of the ESA "take" standard—which the district court expressly rejected—and then to overturn the summary judgment. Indeed, as the district court noted, Seaquarium had challenged the admissibility of Plaintiffs' proffered expert opinions under Federal Rule of Evidence 702, and the district court, having ruled "as a matter of law that the injuries Plaintiffs have proffered do not constitute a 'take,'" did not reach the opinions' admissibility. (R:203:18 n.18).[24] This Court cannot do so.

Whether expert opinion is admissible under Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-92 (1993) is, of course, initially for the district court, subject to review only for abuse of discretion. *E.g., Am. Gen. Life Ins. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009) ("district court must determine that proffered expert testimony is both reliable and relevant" to consider testimony on summary judgment). Because "appellate courts may not make fact findings," *Norelus*, 628 F.3d at 1293, this Court cannot accept Plaintiffs' invitation to consider their expert testimony. *McKissick v. Busby*, 936

---

[23] As noted in the Statement of Jurisdiction, *supra*, PETA and other plaintiffs challenged the Seaquarium's license in an APA proceeding—and lost. *Animal Legal Defense Fund*, 789 F.3d at 1223-25. They cannot renew the APA battle in the guise of an ESA action.

[24] The court did, however, note that "all or most" of the reports did not appear to be based upon "reliable methodologies," and were "speculative and unreliable." (R:203:18 n.18, 38 n.27).

F.2d 520, 522 (11th Cir. 1991) ("[a]s a general rule," appellate courts "will not consider issues which the district court did not decide").

If the Court were to find *any* merit to Plaintiffs' challenge to the district court's standard, the only relief to which Plaintiffs could be entitled would be a remand for the court to rule on Seaquarium's *Daubert* challenges and to consider anew whether to grant summary judgment. *E.g., Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 8 F.3d 760, 769 (11th Cir. 1993). But no such relief can, or should, be afforded to Plaintiffs: the district court correctly construed the ESA's "take" prohibition and deferred to APHIS's findings—and correctly granted summary judgment.

## CONCLUSION

Based on the foregoing, Seaquarium requests the Court to affirm the final judgment in all respects.

Respectfully submitted,

By: /s/ Elliot H. Scherker
Elliot H Scherker

James Hardwick Lister (pro hac vice)
William A. Earnhart (pro hac vice)
Melinda L. Meade Meyers (pro hac vice)
Birch Horton Bittner and Cherot, P.C.
1156 15th Street, NW, Suite 1020
Washington, DC 20005
Telephone: 202.659.5800
jlister@dc.bhb.com
wearnhart@dc.bhb.com
mmeademeyers@dc.bhb.com

Elliot H. Scherker
Brigid F. Cech Samole
Greenberg Traurig, P.A.
333 SE 2nd Avenue, Suite 4400
Miami, FL 33131
Telephone: 305.579.0500
scherkere@gtlaw.com
cechsamoleb@gtlaw.com

*Counsel for Festival Fun Parks, LLC, d/b/a Miami Seaquarium and d/b/a Palace Entertainment*

**CERTIFICATE OF SERVICE**

I certify that this brief has been e-filed and that a copy has been served via the CMF/ECF system on February 9, 2017 upon:

Paul Joseph Schwiep
Coffey Burlington, P.L.
2601 S. Bayshore Drive
Penthouse
Miami, FL 33133
pschwiep@coffeyburlington.com

Jared Goodman (pro hac vice)
Caitlin Hawks (pro hac vice)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
jaredg@petaf.org
CaitlinH@petaf.org

Matthew Liebman (pro hac vice)
Animal Legal Defense Fund
525 E Cotati Ave.
Cotati, CA 94931
mliebman@aldf.org

/s/ Elliot H. Scherker
Elliot H Scherker

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 13,860 words, excluding the parts of the brief exempted by 11th Cir. R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word 2013 in Times New Roman, 14-point font.

/s/ Elliot H. Scherker
Elliot H Scherker